Will the clerk please call the next case? 523-0624-WC, Kathleen De Jarnatt, appellant by Brian McGovern v. Illinois Workers' Compensation Comm'n, Continental Tire, North America, Inc., Appalee, by James Keith. Mr. McGovern, you may proceed. May it please the court. Good afternoon. My name is Brian Kathleen De Jarnatt. Your honors, I am aware of what I'm asking in this case, in the mountain that I'm asking you to scale. I ask you to have an open mind, and I want to make something clear right now. I'm not saying that the mathematics of how 8E-17 is being done is incorrect, that is, subtracting the prior award from the current award. But in order to understand my new proposed methods and the advantages it offers, you must consider the cumulative awards in gross, all the disability added together, and what they mean and how they were arrived at. This is necessary because it is only from this perspective that we can see the problems with the current methodology. This is why I state several times in my brief, you must consider the total number of weeks of disability awarded between all the cases. Your honors, my argument is more of an understanding of how 8E-17 interacts with the entire act scheme of PPD compensation and the process by which those awards are arrived at, rather than a different way of doing the math. However, I also understand that I'm asking you to interpret the language of a statute and find that the change I am requesting better comports with what the legislature intended. I believe it does, and I will discuss that later. But for the next few minutes, I want to explain why it is reasonable to consider the total cumulative or the total of all the awards together in the analysis, when in reality, only the net awards are actually paid. First, we must recognize and appreciate that an award is made following an adversarial trial in which evidence in the form of medical records, lay testimony, expert testimony are offered, admitted, and relied upon by the arbitrator to make a judicial award. Settlements also rely on the same evidence and the two parties agree through a process of negotiation of what the disability reveals, or may I even say allows. Throughout the process of negotiations, even on a settlement, the parties are always asking themselves what they think will happen at trial. Now, my brief offered several examples of the mathematics of the current credit application and my proposed new method, and I don't plan on going through that with you today, but I do want you to consider a couple of more practical examples. Consider a petitioner with two separate injuries to his leg. One is a broken tibia, and the other is a broken fibula. I think it would be reasonable that the first claim would result in a loss of use award of somewhere between 15 and 20 percent, so let's call it 20 percent. Your honors, ask yourself what typically happens in the second claim, the broken fibula. Is the petitioner awarded 20 percent again, or is it much more? Is it something like 40 percent or 30 percent? I think your experience on the bench will show you that with each successive case to the same body part, the awards must keep getting higher and higher and higher. The problem with the current method is it encourages, if not compels, inconsistent, arbitrary, and essentially fictional awards. Again, like I just said, each successive award must be higher. Now, consider this. Instead of a broken tibia and then a broken fibula, you have a broken tibia in the first case as before, and the petitioner is awarded 20 percent of a leg as before, but instead of a broken fibula in the second case, the petitioner suffers a knee strain. Again, what happens in practice? Well, he may gain and get an award of 25 percent for the knee strain, but that would be absurdly high, is it not? Or perhaps he gets what a knee strain or a sprain might go for, which is 5 percent, but the petitioner will actually recover nothing because of the credit. The award of 25 percent for a strain is arbitrary and fictional, and it is made to account, it is made only to account, because there's a credit. Anytime there's a first case, the award is essentially going to be the real case, if you will, but each second case is almost creating a different kind of fictional award. Had the strain occurred first and then the broken tibia, then the absurdity of the high strain award would have most probably would have been eliminated, although keep in mind, instead of 15 percent, had the petitioner broken their tibia first, they would have received 20 percent, and there's always could be a third injury, like a torn meniscus. Then what happens? So, is it fair and equitable that a petitioner who strained their knee in the first case recovers compensation, but not if the strain occurred in the second? I'm sure you've seen this, and not only are some of these awards artificially high, but then the recovery is unusually low. The case at bar is actually a perfect example of this. The petitioner was awarded 22.5 percent of a hand in this case, of a right hand in this case, but she's only going to recover five percent of a hand. That's because there was a 17.5 percent credit. So, again, we have an inordinately high award and an unusually low recovery. I do want you to recognize that in both of the hypotheticals I just provided to you, the petitioner is going to receive 20 percent, and that's what I meant by saying that the math of the current 8E17 is not wrong. It's simply the consequence of the math that is creating the problem, and I'm simply pointing out that 8E17 results in these inconsistent arbitrary awards, even though they stem from actual cases, judicially evaluated under the rules of evidence within the adversarial process. Now, before moving on to whether or not the statute is ambiguous, I do want to mention a public policy problem that exists with 8E17 math as it currently is. More than once, your honors, I have turned down representing the client once I found out that they had several prior injuries that the respondent would get credit for. It was impractical for me to spend the time, effort, and expense on when we recover two or three or four percent, and that was assuming that I was going to get that high PPD award that I've been complaining about here. But in those cases that I declined, the current injury was simply nowhere near severe enough. I can describe how the new method works. If not, I will simply say this. My new method proposes, promotes sound and consistent awards based upon the merits of each case and only the case being adjudicated. There is no longer any need to customize loss of use. But even if you still agree, even if you agree with me, I understand there's still a long way to go. To proceed, there must be an ambiguity in the court. This will allow the court to consider various canons of construction to ascertain legislative intent. I contend that 8E17 is ambiguous on its face because the phrase, and I quote, such loss shall be taken into consideration is ambiguous. More specifically, the phrase taken into consideration. What does the undeducted mean? I'm sorry? What does the undeducted mean that follows taken into consideration? Yes. So taken into consideration, it's not defined, and it just begs the question of what does that mean? And the very fact that we ask ourselves, well, what does that mean, indicates that there can be different reasonable interpretations, which is why it's ambiguous. Did you answer Justice Hoffman's question, though, at the end of that phrase is the two more words, and deducted. So such loss shall be taken into consideration and deducted. Yeah. So I'm with you on that. So here's the thing about that. I am going to admit that I cannot, when we are interpreting this, the new method that I proposed certainly does not take a, it doesn't follow that particular stricture of the act, but it does provide the reduction that the act provides. It's instead of the reduction or the subtraction occurring at the end of the math equation, it occurs up front by deducting the amount of weeks that were awarded from the weeks of 8E remaining. But the weeks argument, we rejected in Village of Niles. We rejected the weeks analysis and said it's the loss that's compared, not the weeks. That's right. I understand your argument. Your argument makes a lot of sense, but isn't it a matter for the legislature? Well, no doubt about that. I would agree with you. I find this whole thing to be pretty complex, but as I've wrestled with this, I have jokingly said that maybe instead of being a lawyer, I ought to run for an assembly member. So the answer is, I do understand that, but, and I do understand the Niles case, which came out while this case was pending, certainly didn't like to see that. But I think that Niles was wrongly decided, and as far as on the weeks and weeks versus percentages, I think it was wrongly decided if for no other reason than the Caterpillar case, the Supreme Court case from 1947 I talk about in my brief, specifically said that the reduction should be by weeks. And then it quote, and I quote the Caterpillar case, no other construction is tenable. And though as the Niles case said, talking about that is that we know the what, the what we are taking into consideration is the loss, and we know that the loss is the prior PPD award. And paragraph 18 of the Niles case, which is the critical paragraph, it states that, and it also correctly states that the only I will tell you as a close inspection of paragraph 18 reveals that the phrase taken into consideration was conspicuously left out. It is this phrase that is ambiguous, and it is this phrase that is meant to the answer the question of how do we do this? So I believe that Niles talked about the what, and it was paragraph 18 was certainly proper and well thought out on the what portion, but not the how portion. And that's where I think the taken into consideration brings ambiguity into play here. Of course, and if there's no ambiguity, the statute will be applied as written. But if there is an ambiguous term, then this court can resort to other rules of construction. One such rule is you must consider the purpose of the law. The purpose of the act is to provide prompt and equitable compensation for work-related injuries. It's a remedial in nature. Another is that the consequences of one construction over another should be considered. The discussion we had earlier regarding artificially high awards, but yet unusually low awards is a consequence of the current methodology, and the new method will better meet the purpose of the act, promoting the consistency. Another rule is this court should consider the real-world consequences of a particular construction. And here again, fictional PPD awards with small recoveries is a real-world consequence as the new method fixes. Moreover, it practically eliminates the very real likelihood that an injured worker with prior the same body part would not be able to secure representation. When the awards are considered cumulatively, and we compare that to what the petitioner actually gets paid, there are inequities. And as I stated in my brief, when we consider all the disability awarded, not the mathematics, and I've explained why that is reasonable to do, there are weeks of disability being awarded that are not being paid. Oh, and here, and then I'll say this, I had this written down, as far as the subtraction goes, the new method, in the new method, the subtraction takes place up front, instead of at the end of each successive award. This is simply another way of taking the loss into consideration, but yet still comporting with the intent of the legislature. Finally, the intent of the legislature was not to award over 100% of a body part. I think that's pretty clear. And yet, to give, and to give a petitioner a full and fair recovery on their last injury, and the new method abides this, whereas the current method readily could have cumulative awards in excess of 100%. And I will save the balance of my time for reply. Mr. McGovern, you're saying it results in awards greater than 100%. Is that what you're saying at the end? If, when we add up all the awards. So, you can just, we can see a situation where if we add up, if a person has multiple awards on the same body part, you add them all up, you get 100% awarded. Now, again, there will not be over 100% paid, okay, but there will be over 100% awarded. Thank you. Any questions from the bench? Okay, thank you, Mr. McGovern. Mr. Keefe, you may respond. Thank you, your honor, and may it please the court. My name is Jim Keefe and I represent Cotton McGovern's first argument about the practical effect of these credits. It is true that the legislature, I think it's clear, did not intend for any body part to be awarded over five or 100% say body as a whole. And so, the current method of subtracting the percentage of loss from a prior claim allows the arbitrators and the commission to put that into effect. So, in this particular case, the arbitrator knew that the employee had bilateral carpal tunnel surgeries and resolved that case for 17.5% of each hand. And there's a new claim several years later has the identical surgeries. And so, the arbitrator said, well, I think that there was some additional disability here, but it wasn't another 10% or 12.5% or 15% of new money. So, the arbitrator did the very practical thing and said, look, I think there's probably another two and a half or 5% disability. So, the practical thing is to do award a little bit more on the higher percentage and then subtract the credit and they get the result. And that's the only way I've ever seen this done, quite honestly. I understand what Mr. McGovern is saying in the case of you have the tibia fracture first and you get the 20% and then you have a knee strain that may only be worth 5%. Well, every case I've ever seen, what the commission does is they award 25% of the leg, apply the 20% credit and then you have net 5% new money. Now, is it true in this particular case that the hand for carpal tunnel repetitive trauma cases has been reduced to 190 weeks as a maximum with no more than 15%? Well, yes, but that was the legislator's intent to reduce the value of carpal tunnel cases. So, what he is asking this court to do is actually make an award for a greater percentage and weeks than what the legislature intended to allow for standard bilateral carpal tunnel surgery. Mr. Goof, let me ask you this question. It's possibly my own non-understanding, but is the system, as Mr. McGovern said, ultimately allowing an injured worker to recover for more than 100%? No, sir, I've never seen that. I do. Hypothetically under this credit scheme, is it not possible? Where the award says you got a prior injury for 80% and you get another 30, so it's 110 minus 80 and that's 30 money. Yes, hypothetically. Yes, sir, I think so. Does that make any sense that you're now supposedly totally disabled with a limb or whatever, okay, that you're still getting money on that every time you hurt that limb? But I don't think you can because I think once they apply the credit, it will always take it back under the 100%. So, in other words, we're really doing math games as opposed to talking about disabling injuries. Well, the math game is always part of it in terms of deciding the percentage of disability and I think that's always inherent in what the commission is doing, at least the way of always seeing it in practice. And I think more towards then the question of ambiguous language for loss of use, and I think I pointed this out in my brief, is that when they amended the statute on 628.11 in particular to the repetitive trauma carpal tunnel cases, they did say in which case the permanent partial disability should not exceed 28.5 weeks of compensation or change the formula somehow. And the same way going all the way back and which was discussed in the Niles case when the leg was going back and forth between 200 and 215, the legislature certainly had an opportunity to change the way credit should be applied and calculated. And on both occasions, they've chosen not to. So, I think the way that it's currently being applied by percentage of loss is supported by the statute. And here, if you had, for example, one case and you had bilateral carpal tunnel surgeries, they didn't go great and you did them again, okay, but all under the same case number, this award of 22.5 and 20 is totally consistent with that and I think that's what the arbitrator was going for here. And so, we'd ask that the court affirm the decision of the commission. Any questions from the court? No? Okay. Thank you, Mr. Keith. Thank you, Your Honor. Mr. Governor, you may reply. Yeah, real quickly. I do think that what Mr. Keith brought up regarding the statutory amendments restricting tapping, if you will, a carpal tunnel repetitive award to be 15% absent clear and convincing evidence reveals, brings upon another rule of construction in this case very well. And that is that the rule of construction that a statute should be construed as a whole and each section should be evaluated in connection with every other section. What's interesting is that it seems that, and if we are going to, and I certainly brought the math games into this case, that any worker who heretofore had an injury, carpal tunnel repetitive trauma and received 15%, then arguably they can never recover for that second injury. In fact, the fact that Ms. DeJarnett was awarded 20% and 22.5%, I guess it kind of begs the question of whether that was proper or whether it's implicit in the decision that having a second injury is clear and convincing evidence. Either way, I don't think that it was the, I certainly don't think that the legislature was considering 8E17 when it put a 15% cap on carpal tunnel repetitive awards. So the bottom line is, and I like how your Honor Justice Holdridge put this, is this idea of juxtaposing, as you put it, math games versus what actually happens in reality is really what got me going on this. And it just sort of occurred to me that when we work up a case and we go to trial, we view that as a separate and distinct matter of disability that we are attempting to prove with all the evidence that's going to go in there in the adversarial process. And when we have 8E17 involved, we sort of kind of, and even I think counsel sort of admitted it, is the arbitrator is kind of forced to drift into this murky little math game instead of simply evaluating the evidence on this case as the arbitrator would on any other case. I will, and so I think that, again, I know the ask, I know what I'm asking is a lot, but I do think that my new method, if understood, makes all awards going forward consistent, not arbitrary, and there needs to, there would be no more, there's no necessity for any more math games as far as I can tell. And I thank you for your time and attention today. Any questions from the court, Mr. McGovern? I have a general question for you, Mr. McGovern, since you've thought about this clearly and are concerned with it, obviously, and rightfully so in some cases. Where is, and you just admitted maybe you should be in the better forum, has there been any proposals to your knowledge or even to Mr. Keefe's knowledge to address this issue? No. I mean, when we use that nice lawyer Latin term, sui generis, I think we're right here. I have bounced this off of other lawyers, and since they don't have more than three or four or five minutes to consider it, it's right. They don't have much to say about it. It's too much. And I don't mean that in a bad way. No. Right. Okay. Very good. Well, thank you. Thank you both. And no further questions from the court. We want to thank both